UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                      :

STEWART A. KAUFMAN, M.D.,          :

               Plaintiff,    :

  -against-                 :   1:11-CV-0667 (MAD/DRH)
                      :

THE COLUMBIA MEMORIAL HOSPITAL, a/k/a :
COLUMBIA MEMORIAL HOSPITAL, JAY P.   :
CAHALAN, individually, and NORMAN A.   :
CHAPIN, M.D., individually,           :
                      :

            Defendants.   :
                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT DISMISSING THE COMPLAINT AND GRANTING THE HOSPITAL'S COUNTERCLAIM

---

GARFUNKEL WILD, P.C.
*Attorneys for Defendants*
111 Great Neck Road
Great Neck, New York 11021
(516) 393-2200

Of counsel:
Andrew L. Zwerling, Esq.
Marianne Monroy, Esq.
Jason Hsi, Esq.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...........................................................................iii

PRELIMINARY STATEMENT ......................................................................1

STATEMENT OF FACTS ............................................................................5

SUMMARY JUDGMENT STANDARD OF REVIEW.................................5

POINT I

PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF
DISABILITY DISCRIMINATION UNDER THE ADA OR NYSHRL.......................................6

    A.  Plaintiff Is Not Disabled ...................................................................6

    B.  Plaintiff Was Not Qualified To Perform His Job Duties.............................12

    C.  The Record Is Devoid of Any Evidence Upon Which An
       Inference Of Discrimination May Be Drawn ..............................19

POINT II

PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF AGE
DISCRIMINATION UNDER THE ADEA OR NYSHRL.......................................21

    A.  Plaintiff Was Not Qualified For His Position.............................22

    B.  The Record Is Devoid of Any Evidence Upon Which An Inference Of
       Discrimination May Be Drawn...............................................22

    C.  Plaintiff's Testimony Confirms That His Age Discrimination Claim Is
       Premised On Nothing But Speculation......................................23

POINT III

PLAINTIFF CANNOT ESTABLISH THAT
DEFENDANTS' ACTIONS WERE PRETEXTUAL ................................25

POINT IV

PLAINTIFF CANNOT ESTABLISH INDIVIDUAL
LIABILITY AGAINST DEFENDANTS CAHALAN AND CHAPIN.......................27

POINT V

PLAINTIFF'S BREACH OF CONTRACT CLAIM LACKS MERIT ........................................28

POINT VI

DEFENDANTS ARE ENTITLED TO REIMBURSEMENT OF MONIES
ADVANCED BASED ON THEORY OF UNJUST ENRICHMENT ........................................29

CONCLUSION ..................................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abdu-Brisson v. Delta Air Lines, Inc.,*
   239 F.3d 456 (2d Cir. 2001) .......................................................................22

*Adams v. Rochester Gen. Hosp.,*
   977 F. Supp. 226 (W.D.N.Y. 1997).............................................................12

*Altman v. New York City Health & Hospitals Corp.,*
   903 F. Supp. 503 (S.D.N.Y. 1995) *aff'd*, 100 F.3d 1054 (2d Cir. 1996) ................................12

*Barbato v. Bowden,*
   63 A.D.3d 1580, 880 N.Y.S.2d 817 (4th Dep't 2009).........................................28

*Bickerstaff v. Vassar Coll.,*
   354 F.Supp.2d 276 (S.D.N.Y. 2004) .............................................................29

*Burke v. Niagara Mohawk Power Corp,*
   142 Fed. Appx. 527 (2d Cir. 2005).................................................................6

*Carlton v. Mystic Transp., Inc.,*
   202 F.3d 129 (2d Cir. 2000) ....................................................................23, 12

*Del Castillo v. Bayley Seton Hospital,*
   172 A.D.2d 796, 569 N.Y.S.2d 168 (2d Dep't 1991).........................................29

*Dieck v. Suffolk County Vanderbilt Museum,*
   2011 WL 4434066 (E.D.N.Y. Sept. 22, 2011) ................................................27

*Dorvil v. Hilton Hotels Corp.,*
   25 A.D.3d 442, 807 N.Y.S.2d 369 (1st Dep't 2006).........................................28

*Farina v. Branford Bd. of Educ.,*
   458 F. App'x 13 (2d Cir. 2011).....................................................................7

*Ferrante v. American Lung Ass'n.,*
   90 N.Y.2d 623, 665 N.Y.S.2d 25 (1997).........................................................5

*Giordano v. Thomson,*
   564 F.3d 163 (2d Cir. 2009) ......................................................................29

*Glozman v. Retail, Wholesale & Chain Store Food Employees Union, Local 338,*
   204 F. Supp. 2d 615 (S.D.N.Y. 2002) ........................................................8, 11

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Graham v. Long Island R.R.*,
  230 F.3d 34 (2d Cir. 2000) ................................................................................20

*Gross v. FBL Fin. Services, Inc.*,
  557 U.S. 167 (2009) ..................................................................................5, 27

*Hamzik v. Office for People with Developmental Disabilities*,
  859 F. Supp. 2d 265 (N.D.N.Y. 2012) ..............................................................20

*Heilweil v. Mount Sinai Hosp.*,
  32 F.3d 718 (2d Cir. 1994) ............................................................................9

*Hill v. Rayboy-Brauestein*,
  467 F.Supp.2d 336 (S.D.N.Y. 2006) ................................................................21

*Huskins v. Pepsi Cola of Odgensburg Bottlers, Inc.*,
  180 F. Supp. 2d 347 (N.D.N.Y. 2001) ..............................................................10

*James v. New York Racing Ass'n*,
  76 F. Supp. 2d 250 (E.D.N.Y. 1999) *aff'd*, 233 F.3d 149 (2d Cir. 2000) ...............23

*Krug v. County of Rennselaer*,
  559 F. Supp. 2d 223 (N.D.N.Y. 2008) ..............................................................20

*Mason v. Cent. Suffok Hosp.*,
  3 N.Y.3d 343 (2004) ....................................................................................28

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ......................................................................................5

*McLee v. Chrysler Corp.*,
  109 F.3d 130 (2d Cir. 1997) ............................................................................12

*Medical Exp. Ambulance Corp. v. Kirkland*,
  79 A.D.3d 886, 913 N.Y.S.2d 296 (2d Dep't 2010) .............................................28

*Meiri v. Dacon*,
  759 F.2d 989 (2d Cir. 1985) ............................................................................12

*Melman v. Montefiore Med. Ctr.*,
  98 A.D.3d 107, 946 N.Y.S.2d 27 (1st Dep't 2012) ............................................25

*Monroe v. Cortland County, N.Y.*,
  37 F.Supp.2d 546 (N.D.N.Y. 1999) ..................................................................9

*Moorehead v. New York City Transit Auth.*,
  385 F. Supp.2d 248 (S.D.N.Y. 2005) *aff'd mem.*, 157 Fed. Appx. 338 (2d Cir. 2005) ...........20

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*O'Connor v. Viacom Inc.*,
  1996 WL 194299 (S.D.N.Y. Apr. 23, 1996) *aff'd*, 104 F.3d 356 (2d Cir. 1996) ...................23

*Pamilla v. Hosp. for Specialty Surgery*,
  223 A.D.2d 508, 637 N.Y.S.2d 689 (1st Dep't 1996) ........................................................29

*Picinich v. United Parcel Serv.*,
  321 F.Supp.2d 485 (N.D.N.Y. 2004) ...................................................................................9

*Price v. Mount Sinai Hosp.*,
  458 F. App'x 49 (2d Cir. 2012) ..........................................................................................10

*Reeves v. Johnson Controls World Services, Inc.*,
  140 F.3d 144 (2d Cir. 1998) ...........................................................................................6, 7

*Restani v. HHS*,
  2004 WL 437462 (N.D.N.Y. Feb. 9, 2004) *aff'd*, 144 F. App'x 197 (2d Cir. 2005)..............23

*Ruhling v. Tribune Co.*,
  2007 WL 28283 (E.D.N.Y. Jan. 3, 2007) .............................................................................7

*Sandhu v. Mercy Medical Center*,
  35 A.D.3d 479, 828 N.Y.S.2d 91 (2d Dep't 2006) ............................................................29

*Schnabel v. Abramson*,
  232 F.3d 83 (2d Cir. 2000) ................................................................................................23

*Schumacher v. Granite Services, Inc.*,
  2012 WL 951545 (N.D.N.Y. Mar. 20, 2012) ......................................................................23

*Shumway v. United Parcel Service, Inc.*,
  118 F.3d 60 (2d Cir. 1997) ................................................................................................20

*Sista v. CDC Ixis North Am., Inc.*,
  445 F.3d 161 (2d Cir. 2006) ..............................................................................................10

*Spadaro v. McKeon*,
  693 F.Supp.2d 183 (N.D.N.Y. 2010)..................................................................................23

*Thornley v. Penton Pub, Inc.*,
  104 F.3d 26 (2d Cir. 1997) ................................................................................................12

*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*,
  534 U.S. 184 (2002) .............................................................................................................7

*Tubens v. Police Dept. of City of New York*,
  48 F. Supp. 2d 412 (S.D.N.Y. 1999) .................................................................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Williams v. 2000 Homes Inc.*,
 2009 WL 2252528 *5 (E.D.N.Y. 2009) ...................................................................20

*Zuk v. Onondaga County*,
 2011 WL 4344043 (N.D.N.Y. Sept. 14, 2011)..................................................22, 27

## PRELIMINARY STATEMENT

Plaintiff was hired by the Hospital, through its now Chief Executive Officer, Defendant Jay Cahalan, to provide services as an orthopedic surgeon. At the time he was hired, Plaintiff was 66 years old. Cahalan Aff., ¶ 4.[1] Plaintiff, through his counsel, negotiated a three year employment agreement, which gave the Hospital the right to terminate his employment if he engaged in conduct creating a threat to the health, safety or welfare of patients and/or due to the non-renewal of his medical staff privileges at the Hospital. Kaufman Tr., p. 142;[2] Cahalan Aff., ¶¶ 36, 42-44.

While Plaintiff speculates that he was terminated due to his age and alleged disabilities, the uncontroverted record demonstrates that his employment was terminated due to his poor performance, which jeopardized patient safety. Cahalan Aff., ¶¶ 45-59. Plaintiff acknowledged that he had higher complication rates with regard to his surgeries, and even admitted to having voluntarily agreed to cease performing large and complex joint surgeries due to complaints about his procedures. Kaufman Tr., pp. 18-19; Cahalan Aff., ¶ 60.

Rather than immediately exercise its right to terminate Plaintiff's employment for cause, the Hospital temporarily relieved Dr. Kaufman from performing complex surgical procedures (*i.e.,* hip and knee replacements) and on-call assignments with no corresponding deduction in compensation, while it attempted to explore a solution to improve Plaintiff's performance and decrease his complication rate. Cahalan Aff., ¶¶ 60-63.

---

[1] References to "Cahalan Aff." refer to the Affidavit of Jay P. Cahalan, dated March 14, 2013.
[2] References to "Kaufman Tr." refer to the deposition transcript of Plaintiff Stewart A. Kaufman, which is contained in Defendants' separately bound volume of summary judgment exhibits accompany this motion. *See* S.J. Ex. 18.

2025122v.12

Given the quality concerns, the Hospital retained a neuropsychological expert, Aaron Nelson, Ph.D., at its own cost, to examine Dr. Kaufman and to opine on his ability to competently and safely practice medicine. Cahalan Aff., ¶ 64. In his July 2009 report, Dr. Nelson found, among other things, that Plaintiff suffered from cognitive deficiencies that affected his ability to maintain attention and focus and that his practice of medicine "needed to be closely monitored at this time" as if he were a medical resident. Dr. Nelson also recommended that Plaintiff undergo a comprehensive follow-up neuropsychological consultation to probe the cause of the identified performance issues and whether they could be remedied to permit him to safely return to practice. Cahalan Aff., ¶¶ 67-74; S.J. Ex. 6.

Still, rather than end his employment, the Hospital permitted Plaintiff to take a leave of absence to pursue the recommended follow-up consultation, based on its understanding that Plaintiff would report back with the results of the evaluation and provide clearance that he could safely return to practice. Cahalan Aff., ¶¶ 93-94; S.J. Ex. 11. While on leave, the Hospital even advanced Plaintiff nearly $37,000 in paid vacation benefits. Cahalan Aff., ¶ 97.

Disturbingly, during meetings and correspondence with the Hospital to discuss whether he underwent a follow-up examination, Plaintiff admittedly concealed from the Hospital that he had been seen by a doctor of his choice, Dr. Albert M. Galaburda. Worse yet, Plaintiff concealed that Dr. Galaburda **twice warned that he could not safely practice medicine**. *See* Kaufman Tr., pp. 55, 63, 72. In disregard of such warnings by his own physician, and without any apparent regard to patient safety, Plaintiff petitioned the Hospital to return to work, and applied to renew his clinical privileges in January 2010. Kaufman Tr., p. 63; Cahalan Aff., ¶¶ 105-107.

2

In the absence of Plaintiff's complete renewal submission, including the requisite report confirming that Plaintiff could safely return to practice, the Hospital was constrained to terminate Plaintiff's employment.  Cahalan Aff., ¶¶ 112-118; Kaufman Tr., pp. 76, 78.

Now, despite having been twice warned by his own physician that he could not safely practice medicine, Plaintiff commenced this suit asserting that the Defendants discriminated against him on account of various alleged disabilities and his age in violation of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and the New York State Human Rights Law ("NYSHRL").  Plaintiff asserts a breach of contract claim based on an alleged violation of the Hospital's By-Laws. *See* Amended Complaint, S.J. Ex. 19.

Plaintiff's disability claims are *not* premised on any cognitive or mental impairment.  To the contrary, Plaintiff's disability claims are premised on various alleged surgeries and ailments that were purportedly known to the Hospital *when it hired* him, and according to Plaintiff, were fully resolved and/or did not limit his ability to function at work or in his private life.  These conditions include bilateral cataracts, degenerative disc disease and stenosis of the foramina, splenectomy, small cell lymphoma, laparotomy, large cell lymphoma.  Zwerling Decl., ¶ 34. Plaintiff also relies on an alleged sleep apnea condition that, according to Plaintiff's own testimony, was diagnosed and resolved while he was out on a leave.

Plaintiff's age claims are equally without merit.  During his deposition, Plaintiff illogically speculates that he was subjected to age discrimination on account of a few cases that were found to be not "up to standards."  Plaintiff also alleges that his contract was shorter in duration than other physicians due to his age.  However, Plaintiff admits that he did not question the length of his contract with his attorney or Defendant Cahalan, and explained that it was *his*

3

"thought that [he] was going to work for three years and then [he] was going to do IME's and settle out into some pasture somewhere." Kaufman Tr., p. 145.

As detailed below, the undisputed record shows that Plaintiff's claims of discrimination are baseless and belied by his own testimony and indisputable documentary evidence demonstrating that Plaintiff cannot establish a *prima facie case* of discrimination. Among other compelling reasons, Plaintiff cannot establish the requisite element of a *prima facie* case that he was qualified to perform his essential job functions; particularly given the two reports of his own physician warning that he could not safely return to practice. Further, Defendants' actions to protect patient safety in the face of Plaintiff's acknowledged performance deficiencies, cannot conceivably be deemed pretext for discrimination, particularly in light of Defendants' numerous efforts to maintain the employment relationship.

To allow Plaintiff's discrimination claims to proceed, in the face of Plaintiff's admissions and evidence establishing that the Hospital took appropriate action to prevent Plaintiff from jeopardizing patient safety, would controvert the legislative purpose of the ADA, ADEA and NYSHRL.

As a matter of law, Plaintiff also cannot maintain a breach of contract claim based on an alleged violation of the Hospital's By-Laws. Any claim based on an alleged violation of the By-Laws had to be brought by Plaintiff as a claim for mandamus under Article 78 of the CPLR within the applicable four-month statute of limitations period, which has expired.

Finally, given Plaintiff's intentional misrepresentations and admitted concealment of Dr. Galaburda's warnings while he was out on leave (including his failure to disclose the same in his renewal application for clinical privileges), Defendants ask the Court to grant the Hospital's counterclaim for unjust enrichment and order Plaintiff to reimburse the Hospital for

4

compensation advanced to him in anticipation of his return from leave. Kaufman Tr., pp. 55, 63, 72.

## STATEMENT OF FACTS

A recitation of the undisputed factual history is found in the Defendants' Local Civil Rule 7.1(a)(3) Statement of Material Facts, dated March 19, 2013, and the Affidavit of Defendant Jay Cahalan, the Hospital's Chief Executive Officer, dated March 14, 2013 ("Cahalan Aff."). The procedural history and additional undisputed facts are set forth in the Declaration of Andrew L. Zwerling, Esq., dated March 14, 2013.

## SUMMARY JUDGMENT STANDARD OF REVIEW

Discrimination claims brought under the NYSHRL, the ADA and the ADEA are analyzed under the legal framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Ferrante v. American Lung Ass'n.*, 90 N.Y.2d 623, 629, 665 N.Y.S.2d 25, 28-29 (1997). This framework provides a three-part analysis. A plaintiff must first establish a *prima facie* case. If a plaintiff does this, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse action. If the defendant does so, the burden shifts back to the plaintiff to demonstrate by competent evidence that the articulated non-discriminatory reason for defendant's action is in fact a pretext for discrimination. *Id.*

With regard to disparate treatment claims pursuant to the ADEA, the Supreme Court has held that a plaintiff must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action, not just a potential motivating factor. *Gross v. FBL Fin. Services, Inc.*, 557 U.S. 167, 177 (2009).

2025122v.12

## POINT I

## PLAINTIFF CANNOT ESTABLISH A *PRIMA FACIE* CASE OF DISABILITY DISCRIMINATION UNDER THE ADA OR NYSHRL

To state a *prima facie* case of disability discrimination under federal law, a plaintiff must show that: (i) the employer is subject to the ADA; (ii) he suffers from a disability within the meaning of the ADA; (iii) he could perform the essential functions of the position with or without a reasonable accommodation; and (iv) he was discharged or suffered an adverse employment action because of his disability. *See Reeves v. Johnson Controls World Services, Inc.,* 140 F.3d 144 (2d Cir. 1998); *see also Burke v. Niagara Mohawk Power Corp,* 142 Fed. Appx. 527 (2d Cir. 2005). In *Picinich v. United Parcel Services,* this Court recognized that the analysis of disability claims under the NYSHRL parallels that used in the ADA context. 321 F.Supp.2d 485, 500, n. 14 (N.D.N.Y. 2004).

As detailed below, Plaintiff cannot meet the second, third or fourth prong of his *prima facie* burden to maintain his disability discrimination claims.

## A.   Plaintiff Is Not Disabled

In his Complaint, Plaintiff lists numerous surgeries and ailments that pre-dated his employment at the Hospital, and which allegedly rendered him disabled. These included: bilateral cataracts, degenerative disc disease and stenosis of the foramina, splenectomy, small cell lymphoma, laparotomy, large cell lymphoma. Zwerling Decl., ¶ 34; S.J. Ex. 19, ¶¶ 59-65. Notably, in Plaintiff's prior New York State Division of Human Rights discrimination complaint, in which he was represented by counsel, Plaintiff alleged only that the Hospital discriminated against him on account of an alleged "chronic degenerative disc disease and sleep apnea," and

none of the numerous other ailments now identified as "disabilities" in this suit. Kaufman Tr., pp. 15-16; S.J. Ex. 20.

### 1.  Plaintiff's Alleged Impairments Do Not Qualify As Disabilities

Under the ADA, a "disability" is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C.A. §§ 12101-12213; *see Reeves,* 140 F.3d at 149-150.

By Plaintiff's own testimony, his alleged medical conditions and impairments do not substantially limit one or more major life activities.[3]  *See* 29 C.F.R. §1630-2(j)(1)(ii).  Physical or mental impairments, standing alone, do not necessarily constitute ADA disabilities.  *See Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 195 (2002).

Plaintiff affirmatively denied any physical, mental, or emotional issues when he applied to renew his clinical privileges in January 2010, which was shortly before he was terminated on January 27, 2010.  S.J. Exs 15, 17.  Plaintiff confirmed the accuracy of his prior representation that he was free of any physical, mental or emotional issues at the time he applied to renew his clinical privileges. Zwerling Decl., ¶ 45; S.J. Exhibits 15, 27, ¶ 40; Kaufman Tr., pp. 33-34.

Plaintiff also admitted that he was, at all relevant times, able to walk, stand, sit, bend over, and work.  *See* S.J. Ex. 27, ¶ 40; *Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 15 (2d Cir. 2011) (back injuries did not constitute disability, and no evidence that her prior back surgeries continued to affect plaintiff during relevant period); *Ruhling v. Tribune Co.*, 2007 WL

---

[3] Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i).

28283 (E.D.N.Y. Jan. 3, 2007) ("an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives").

Plaintiff also testified that following his termination he continued to have the ability to work and perform independent medical examinations through his private company. Kaufman Tr., pp. 31-32; S.J. Ex. 27, ¶ 42; *Glozman v. Retail, Wholesale & Chain Store Food Employees Union, Local 338*, 204 F. Supp. 2d 615, 622 (S.D.N.Y. 2002) (although employee with back injury could no longer perform his sanitation job, he was not disabled under the ADA as he could work elsewhere doing a variety of other jobs.).

With regard to the alleged conditions underlying this lawsuit, Plaintiff confirmed during his deposition that none of these alleged medical conditions impaired his ability to function:

    (a)    With respect to the alleged 1981 endoscopic surgery, when asked whether he suffered from any side effects as of his hiring by the Hospital in June 2008, Plaintiff replied "No." Kaufman Tr., p. 9. He also testified that this surgery "didn't interfere" with his ability to function as a physician or his private life. Kaufman Tr., p. 12.

    (b)    With respect to the alleged cataract procedures, Plaintiff stated "years ago I had cataract surgery, and my eyesight is terrific." When asked whether he suffered any side effects from his 2008 cataract surgery, he replied "absolutely not except [sic] very good." Kaufman Tr., p. 9.

    (c)    With respect to the alleged 1996 back surgery to stabilize his degenerative disc disease and stenosis of the foramina, when asked whether he suffered from any side effects, Plaintiff testified that he had some side effects, which he addressed by "wearing a weight lifting belt when he operated to give him a little extra support." Kaufman Tr., pp. 9-10.

    (d)    With respect to his alleged general back condition, when asked if he was able to perform surgery, he replied "I could do everything" and "managed to deal with [the back problem] pretty well." Kaufman Tr., pp. 10-11.

(e)     Plaintiff denied any side effects from his alleged 1997 splenectomy as of his hiring by the Hospital in June 2008.  Kaufman Tr., p. 10.

(f)     Plaintiff denied any side effects from his alleged 1997 chemotherapy to treat small cell lymphoma as of his hiring by the Hospital in June 2008. Kaufman Tr., p. 10.

(g)     With regard to Plaintiff's alleged 2001 laparotomy and chemotherapy to treat large cell lymphoma, he testified that as of June 2008 when he was hired, he had some "residual side effects" of feeling "a little bit tired" in the morning, but "totally functional" both at work and in his private life. Kaufman Tr., p. 11.

(h)     Plaintiff also testified that his lymphoma "by 2008 was pretty much under control." Kaufman Tr., p. 12.

Given that these conditions pre-dated his employment and admittedly did not limit his functioning at work or in his private life, such conditions cannot be relied upon to support a *prima facie* burden of disability discrimination under the ADA.  *Picinich v. United Parcel Serv.*, 321 F.Supp.2d 485, 500 (N.D.N.Y. 2004) ("[T]he court's focus must be on whether [plaintiff] was disabled 'at the time the adverse action occurred.'"); *Monroe v. Cortland County, N.Y.*, 37 F.Supp.2d 546, 553 (N.D.N.Y. 1999); *see also Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 726 (2d Cir. 1994) (affirming dismissal of plaintiff's claim because "at the time the adverse employment decision was made [plaintiff] was not a handicapped person under the Act").

As for Plaintiff's sleep apnea, which was allegedly diagnosed in September 2009, in response to Defendants' Request For Admission No. 39 (*i.e.,* "Plaintiff did not notify the hospital of his sleep apnea diagnosis during his employment with the hospital"), Plaintiff responded: "Admit however [the Hospital] placed Plaintiff on involuntary leave **prior to his diagnosis of sleep apnea. Further, Plaintiff was successfully treated for sleep apnea shortly after his diagnosis."** Zwerling Decl., ¶ 44; S.J. Exhibit 27, ¶ 39 (emph. added).  Given such admission, Plaintiff cannot now assert that Defendants discriminated against him on the basis of an alleged

9

sleep apnea condition that was unknown to any of the Defendants, and fully treated while he was out on leave. *Price v. Mount Sinai Hosp.*, 458 F. App'x 49, 51 (2d Cir. 2012) (plaintiff did not suffer from a disability under the ADA where alleged difficulties were alleviated by medication, and plaintiff did not provide any details of her disability to her supervisors); *Huskins v. Pepsi Cola of Odgensburg Bottlers, Inc.*, 180 F. Supp. 2d 347, 351 (N.D.N.Y. 2001) ("[a] disability under the ADA 'does not include temporary medical conditions, even if those conditions require extended leaves of absence from work' because such conditions are not substantially limiting").

For the reasons above, particularly Plaintiff's affirmative denial of any physical, mental, or emotional issues when he applied to renew his clinical privileges in January 2010 in the wake of his termination (S.J. Ex. 15), Plaintiff also cannot establish that he was disabled even under the NYSHRL's broader definition of disability.[4]   *Sista v. CDC Ixis North Am., Inc.*, 445 F.3d 161, 169 n. 2 (2d Cir. 2006).

### 2.  Plaintiff Cannot Demonstrate He Was Regarded As Disabled Or He Had A Record Of The Alleged Disabilities Underlying This Suit

According to Plaintiff's own testimony, he never reported to Defendants any disabling condition.  During his deposition, Plaintiff had no specific recollection of giving the Hospital written notice of any of his alleged disabilities underlying this lawsuit:

> Q:    Can you describe that written notification for us?
>
> A:    I don't recall?
>
> Q:    Did you send it?

---

[4] NYSHRL protects individuals with actual impairments that either (1) prevent the exercise of a normal bodily function, or (2) are medically diagnosable under medically accepted clinical or laboratory diagnostic techniques. *See* Executive Law § 292 (21).

A:     I believe I did.  I would of sent something, but I don't recall what it said.

Q:     Do you remember when you sent it?

A:     No.

Q:     Do you remember who you sent it to?

A:     No.

Q:     Do you have a copy of it?

A:     Not that I recall.

Kaufman Tr., p. 41.

Plaintiff also disclaimed any physical, mental, or emotional issues on his application to renew his clinical privileges in January 2010, which was submitted shortly before he was terminated.  *See* S.J. Exhibit 15.

As for Plaintiff's alleged ongoing back problems, Plaintiff admits that he "could do everything" and has "managed to deal with it pretty well."  Zwerling Decl., ¶ 47; Kaufman Tr., pp. 10-11.  During his deposition, Plaintiff also testified that he mentioned having back problems to just a few individuals, but that he dealt with his back problems by wearing a weight lifting belt and getting assistance to transfer patients between the gurney and exam table.  Kaufman Tr., pp. 35-39.  *See Glozman,* 204 F. Supp. 2d at 621 (although prolonged sitting, bending, and lifting in excess of ten pounds by the plaintiff was contraindicated by his physician, such back condition did not render plaintiff disabled).

The absence of any "record" or "perception" by Defendants of Plaintiff being disabled with regard to any of the alleged medical conditions underlying this lawsuit is further

11

demonstrated by Plaintiff's admission that he never requested an accommodation for any of the alleged medical conditions underlying this lawsuit, other than informally seeking assistance to move patients (*see* Kaufman Tr., p. 83-84) between the exam tables and gurney — which assistance he received. *See* Zwerling Decl., ¶ 48; Kaufman Tr., p. 37-38.

**B.**     **Plaintiff Was Not Qualified To Perform His Job Duties**

Courts have consistently held that the second prong of a *prima facie* case of discrimination requires a plaintiff to show that he was "otherwise qualified" to perform his essential job functions and satisfactorily performed his job duties. *Cruz*, 202 F.3d at 567; *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). In determining whether an employee's job performance was satisfactory, courts have relied on the employer's job criteria, and not on the subjective opinion of the employee. *Thornley v. Penton Pub, Inc.*, 104 F.3d 26, 29 (2d Cir. 1997); *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) (employee's performance must meet employer's expectations, and not his own).

Medical professionals who pose a risk of danger to patients are not qualified to perform their essential job functions, and therefore, cannot meet their *prima facie* burden of discrimination. *See Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 233 (W.D.N.Y. 1997) (summary judgment appropriate where "employee poses a significant risk to the health and safety of others which cannot be eliminated by reasonable accommodation"); *Altman v. New York City Health & Hospitals Corp.*, 903 F. Supp. 503, 508 (S.D.N.Y. 1995) *aff'd*, 100 F.3d 1054 (2d Cir. 1996) (physician, as an alcoholic, was not qualified to serve as hospital's chief of internal medicine).

1.      **Two Independent Physicians Find Plaintiff Unfit To Practice**

It cannot reasonably be disputed that Plaintiff had serious performance issues, including significantly more complications arising from his total knee replacement ("TKR") surgeries; his hip replacement surgeries took longer than national standards; and there were complaints from the Hospital's staff about his performance in the operating room.  Cahalan Aff., ¶¶ 45-59; S.J. Ex. 4.  Not even Plaintiff contested these facts at the time he was confronted with them.  To the contrary, he voluntarily agreed with the Hospital's proposals on how to respond to those performance issues.  S.J. Ex. 4; S.J. Ex. 6;  Cahalan Aff., ¶¶ 60-65; Kaufman Tr. p. 127.

In an effort to identify possible sources of Plaintiff's performance deficiencies, the Hospital paid for Plaintiff to undergo a neuropsychological examination by Aaron Philip Nelson, Ph.D.  Cahalan Aff., ¶ 64; Kaufman Tr., p. 95.  According to Dr. Nelson's July 22, 2009 report (the "Nelson Report"), Plaintiff reported to Dr. Nelson that he experienced trouble performing TKR surgeries and experienced longer than average times for his hip replacement surgeries:

> [Dr. Kaufman] mentioned a review of his total knee replacement surgeries that revealed an elevated frequency of re-do procedures.  He subsequently learned that the technique he had been utilizing had been out of favor in the surgical community.  He explained that he had not known that the technique had been discontinued until the review occurred.  A review of his total hip replacement procedures indicated a longer than average surgical time; he attributed this to the physically strenuous nature of the procedure (and his back pain) and discontinued performing this operation.

S.J. Ex. 6.

The Nelson Report also stated that Plaintiff reported being  "slightly inattentive at times" and "occasionally stated that his focus was waning."  S.J. Ex. 6; *see also* Kaufman Tr., p. 113. Disturbingly, the Nelson Report found:

IMPRESSION: The neuropsychological examination reveals variability in the sphere of attention and executive function. Performance on measures of simple attention span were in the average range; I suspect these scores are considerably lower than his optimal baseline. He was **unable to contend with WCST, a task entailing nonverbal reasoning and responsivity to corrective feedback** . He exhibited a **deficit in sustained attention** on the Connors CPT and **made errors in tasks of response inhibition**…and complex motor programming… His learning curve was quite shallow and he made a large number of within-trial repetitions, again implicating problems with self-monitoring. **Performance on measures of manual motor speed and dexterity were suggestive of diminished agility with the left hand.**

**Regardless of the basis, these findings are concerning with respect to Dr. Kaufman's ability to sustain attention and focus over extended periods of time. To the extent that his work involves this type of sustained concentration, the examination does have adverse implications for his current capacity to practice. It is my opinion that his practice should be closely monitored at this time.**

I will also discuss these findings directly with Dr. Kaufman and encourage him to pursue neurological follow-up as part of his personal medical care."

S.J. Exhibit 6 (emphasis added).

Among other things, Dr. Nelson also informed the Hospital's Medical Director, Defendant Chapin, that if Plaintiff were to continue to practice, he would need to be monitored at the level akin to the observation necessary for a medical resident in a training program and recommended a very intensive peer review process to confirm Plaintiff's capabilities. Cahalan Aff., ¶ 72-74; Zwerling Decl., ¶ 68; S.J. Ex. 6.

Dr. Nelson also wrote Plaintiff, by email dated August 25, 2009, that:

**If you are simply looking for a physician to issue an OK to resume practice ASAP, you may be disappointed by both the content and pace of this process.** In terms of

> extended periods of time, the concerns arising from my findings relate to both attentional focus within the moment and across the day. What I mean is that your performance on testing raised concerns about your ability to mount and sustain effective attention to a task at hand. In addition, we know that fatigue will amplify this type of problem over the course of hours or a day. This is why I recommended close monitoring of your practice.

S.J. Ex. 7.

Unbeknownst to the Hospital, on August 26, 2009, Plaintiff's own physician, Albert M. Galaburda, M.D. diagnosed Dr. Kaufman with mild microvascular change in the brain. Zwerling Decl. ¶ 70; S.J. Ex. 28. Dr. Galaburda informed Plaintiff that "you have microvascular disease, not severe, but in combination with other factors it could make you more vulnerable to have cognitive changes." S.J. Ex. 29.

Still, Plaintiff pursued Dr. Galaburda for clearance to return to practice. On August 27, 2009, Plaintiff asked Dr. Galaburda whether he could perform non-surgical, office-based visits. In no uncertain terms, Dr. Galaburda informed Plaintiff that "**I do not think you should practice medicine of any type until we get the results of the sleep evaluation**, find out whether you do have apnea or other sleep abnormality, and see whether your oxygen desaturates during sleep." Zwerling Decl. ¶ 72; S.J. Ex. 29.

Despite Dr. Galaburda's warning from the previous day that he not practice medicine of any kind, during an August 28, 2009 meeting Plaintiff had with Defendants Cahalan and Chapin to discuss his performance issues, Plaintiff admitted petitioning them to return to work:

> Q.   Okay. And in this document [notes of August 28, 2009 meeting] you make reference to attempts or requests by you to commence practicing medicine again?
>
> A.   Yes.

2025122v.12

> Q.      So do you recall if at that meeting you were asking to start practicing medicine even perhaps being monitored by a PA?
>
> A.      Yes.
>
> Q.      But isn't it a fact that the day before Doctor Galaburda in Exhibit 11 had said that you should not practice medicine of any type?
>
> A.      Yes.
>
> Q.      But the next day you were asking the hospital to start practicing medicine?
>
> A.      It was part of the discussion, yes.

Kaufman Tr., pp. 62-63; *see also* Cahalan Aff., ¶¶ 89-91.

Plaintiff also admitted that in his October 10, 2009 email to Defendant Cahalan, he did not disclose the findings of Dr. Galaburda, and actually misrepresented that he had not yet undergone the follow-up neuropsychological examination. Kaufman Tr., pp. 123-124; S.J. Ex. 11. Plaintiff's medical records obtained during discovery also reveal that Dr. Galaburda examined Plaintiff again on December 3, 2009. Dr. Galaburda made the following notes in Plaintiff's medical chart:

> Last time, the initial evaluation gave evidence for a sleep disorder. In fact, he was diagnosed with severe obstructive sleep apnea and has been on CPAP since September. He states that he is much more rested. Previously, he'd fall asleep in the car as a passenger, and could not read more than a few minutes without falling asleep. He did not fall asleep during the whole ride from NY State and now he can read for hours. However, he had an episode of pneumonia and streptococcal bacteremia in October and was hospitalized for 10 days, eight of them in the Unit. I have a report that he brought, but there is no mention of the mental status.
>
> He has been forbidden from seeing patients in any capacity by his hospital, which upsets him. He claims that now that his sleep apnea is treated, he should be allowed to see medical type patients, and agrees that he does not have to do surgery. **However, when he describes what the job entails, what the responsibilities are,**

16

**and what cognitive challenges are in seeing patients in the office, he doesn't seem to understand them.**

On examination he looks flushed in the face, especially in the area of the CPAP mask. He has no tremor or shift. His digit span is unchanged at 5-6. He does one better on Stroop 3, but takes the same length of time.

**We have a long conversation about his options. I recommend that he wait 2-3 more months and repeat the NP evaluation with Dr. Nelson at BWH, who did his initial evaluation. He will continue to be followed by the Sleep Unit and continue to use the CPAP machine. Even though he is reporting a good result, he tends to minimize his symptoms and will need to have some objective measure of his sleep apnea with treatment. <u>I will see him again in two months, but I do not recommend that he go back to work as a doctor now</u>.**

S.J. Ex. 32 (emphasis added); *see also* Zwerling Decl. ¶ 77.

Again, Plaintiff admitted he chose not to disclose such critical information to the Hospital about his inability to perform his essential job functions. Kaufman Tr., pp. 72-73. Based upon the Nelson Report and Dr. Galaburda's findings, Dr. Kaufman was not qualified to practice. *See, e.g., Tubens v. Police Dept. of City of New York*, 48 F. Supp. 2d 412, 419 (S.D.N.Y. 1999) (based upon plaintiff's own physician's determination, defendant police department's physician confirmed that plaintiff was not able to perform the physical activities of a police officer).

## 2.   <u>Plaintiff Testified To His Inability To Perform Essential Functions</u>

On the one hand, to support his *prima facie* case of disability and age discrimination, Plaintiff contends that he can perform his essential job functions, insisting that "he could do everything," and denying that he "suffers from any physical, mental, or emotional issues." Kaufman Tr., pp. 33-34; S.J. Exhibit 15. Yet, on the other hand, Plaintiff's testimony and documentary evidence demonstrate otherwise. Kaufman Tr., p 5, 55, 72.

17

In his prior NYSDHR complaint, Plaintiff refers to having "back pain" and said that he would have to "sit down whenever possible or brace himself against the operating table for support" and "[i]n recognition of this reality, [he] voluntarily offered to cease performing large joint surgeries (which can last many hours) and to focus [his] practice on non-surgical visits and assessments, independent medical exams and less complex orthopedic surgeries…." S.J. Ex. 20, ¶10-11.  Plaintiff reiterated the same at his deposition:

> A.    Well, the reality was I was really hurting at the end of two hours, and since they had complaints, even though I don't agree that those complaints were valid, I said it's not important.  I don't have to do those.

Kaufman Tr., p.19.

In reference to complaints made by anesthesiologists in Spring 2009 that Plaintiff "was not doing well in the OR," Plaintiff acknowledged his own inabilities and did not claim the complaints about his performance were based on discriminatory animus:

> A.    I guess at that time I was starting to develop sleep apnea.
>
> * * *
>
> Q.    But are you writing here that the complaints were caused by your sleep apnea?
>
> A.    No, it's just the complex of problems.  Okay.  I was tired and my back would hurt me, and at the end of a two, two and a half hour case, I was washed out.
>
> Q.    And those issues including your back, are you saying may have caused the complaints to be generated?
>
> A.    Yes.

Kaufman Tr., p. 21.

18

Case 1:11-cv-00667-MAD-CFH   Document 40-41   Filed 03/19/13   Page 26 of 37

Similarly, in correspondence to the EEOC, Plaintiff stated that his back problems "made it difficult for [him] to perform long surgeries that required me to be on my feet for extended periods although [he] was able to perform such surgeries under difficult conditions." S.J. Ex. 21; Kaufman Tr., p. 24.  Notably absent is any allegation that Plaintiff ever sought any form of accommodation. Rather, Plaintiff insisted he could perform surgery in the face of such stated physical difficulties (apparently while overlooking any potential dangers to his patients).

Plaintiff's medical malpractice history is a further reflection of Plaintiff's inability to competently perform his job.  Plaintiff acknowledged during his deposition that he was the subject of multiple malpractice actions (Kaufman Tr., p. 5).  Plaintiff initially recalled during his deposition settling three malpractice cases, including two cases that were settled between July 2009 through the date of his deposition (October 4, 2012), which settled for significant sums; one for over $800,000 and another case for $245,000.  Kaufman Tr., pp. 111-112; S.J. Ex. 33. During his deposition, Plaintiff later recalled settling another case in 1993 for approximately $400,000, and yet another in 2004 for $10,000.  Kaufman Tr., pp. 124-125; S.J. Ex. 33.  Plaintiff also testified that he currently has two open malpractice cases pending against him, and acknowledged that he did not contest a charge issued against him by the Office of Professional Medical Conduct for "performing professional services which have not been duly authorized by the patient" for which he was censured.  Kaufman Tr., pp. 79-81; 126; S.J. Ex. 33.

## C.   The Record Is Devoid of Any Evidence Upon Which An Inference Of Discrimination May Be Drawn

A plaintiff may raise an inference of discrimination and satisfy the fourth prong of a *prima facie* case by showing that the employer subjected him or her to disparate treatment.  In other words, Plaintiff would have to establish that he was treated less favorably than a similarly

19

2025122v.12

situated, non-disabled employee. *See Graham v. Long Island R.R.,* 230 F.3d 34 (2d Cir. 2000); *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). Plaintiff has to do more than simply claim membership in a protected class. *See Moorehead v. New York City Transit Auth.*, 385 F. Supp.2d 248, 252-53 (S.D.N.Y. 2005) *aff'd mem.*, 157 Fed. Appx. 338 (2d Cir. 2005) (holding that merely offering evidence that plaintiff was a member of a protected category is not enough to establish a *prima facie* case).

Attempting to meet the fourth prong of his *prima facie* burden, Plaintiff alleges that he was offered fewer benefits and subjected to more aggressive scrutiny than *unidentified* "similarly situated doctors who did not have and/or were not perceived to have a 'disability' as the term is defined under the ADA." See. S.J. Ex. 19, ¶¶ 143-144. Plaintiff, however, does not identify any similarly situated employee who was treated more favorably due to being non-disabled. *See* Kaufman Tr., p. 24-25.[5]

Such conclusory and speculative allegations are insufficient to demonstrate unlawful disparate treatment. *Hamzik v. Office for People with Developmental Disabilities*, 859 F. Supp. 2d 265, 280 (N.D.N.Y. 2012) ("Conclusory allegations of disparate treatment or plaintiff's personal opinion that such treatment was motivated by discriminatory intent is not enough to prevail on an equal protection claim"); *Krug v. County of Rennselaer*, 559 F. Supp. 2d 223, 239 (N.D.N.Y. 2008) ("Plaintiffs' broad conclusory allegations of disparate treatment or discrimination are insufficient to sustain the claim"); *Williams v. 2000 Homes Inc.*, 2009 WL 2252528 *5 (E.D.N.Y. 2009); *Hill v. Rayboy-Brauestein*, 467 F.Supp.2d 336, at *6 (S.D.N.Y. 2006).

---

[5] As detailed in Point II.C, in relation to his alleged age discrimination claims, Plaintiff identified during his deposition two individuals he felt received more favorable treatment due only to their younger age. S.J. Ex. 19, ¶¶ 28-29.

2025122v.12

There is also a complete absence of any circumstances upon which an inference of discrimination could be found.  Notably, Plaintiff testified that it was his belief that his alleged conditions underlying his disability suit were known to the Hospital *at the time it hired him*, except for a sleep apnea condition, which Plaintiff admits was not diagnosed until September 2009 when he was already out on leave.  Zwerling Decl. ¶ 9; Kaufman Tr., p. 42; S.J. Ex. 19, ¶ 98.

Additionally, in the face of Plaintiff's serious performance deficiencies, Defendants chose not to immediately terminate Plaintiff's employment.  Cahalan Aff., ¶ 49.  The Hospital agreed to temporarily relieve Dr. Kaufman from performing the more complex and generally lengthy surgical procedures (*i.e.,* hip and knee replacements) and on-call assignments, while it continued to explore with him the underlying reasons for his performance deficiencies, and a solution to improve his performance and decrease his complication rate.  Cahalan Aff., ¶¶ 60-63.  As a further benefit, Dr. Kaufman's compensation and benefits were kept fully intact despite the significant reduction in his services and responsibilities.  Cahalan Aff., ¶ 62.  Defendants also enabled Plaintiff to take a leave of absence to pursue Dr. Nelson's recommended evaluation and obtain clearance to safely return to work, during which time the Hospital advanced Plaintiff paid vacation benefits to provide him with a source of income.  Cahalan Aff., ¶¶ 93-94.

## POINT II

### PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE OF AGE DISCRIMINATION UNDER THE ADEA OR NYSHRL

To establish a *prima facie* case under the ADEA, a plaintiff must establish that:  (1) he belongs to a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances surrounding the adverse action give rise to an

2025122v.12

inference of discrimination. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001); *Zuk v. Onondaga County*, 2011 WL 4344043 (N.D.N.Y. Sept. 14, 2011). Plaintiff cannot meet the second and fourth prongs of a *prima facie* age claim for the same reasons he could not establish a *prima facie* disability claim. Age discrimination suits brought under the NYSHRL are subject to the same analysis as claims brought under the ADEA. *Id.*

**A.**      **Plaintiff Was Not Qualified For His Position**

As detailed in Point I(B) above, Plaintiff cannot establish the requisite second prong of his *prima facie* case that he was qualified to hold his position. Most significantly, Plaintiff own physician twice warned, in reports concealed from Defendants, that Plaintiff was unfit to practice medicine. Kaufman Tr., 55, 63, 72; S.J. Exs. 29, 32.

**B.**      **The Record Is Devoid of Any Evidence Upon**
            **Which An Inference Of Discrimination May Be Drawn**

For the reasons detailed in Point I(C) above, Plaintiff also cannot establish the requisite fourth prong of his *prima facie* case that circumstances surrounding the adverse action give rise to an inference of discrimination. *See generally Abdu-Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 468 (2d Cir. 2001). New York's federal and state courts have acknowledged that, when considering whether a plaintiff has sufficiently demonstrated discriminatory intent, "'some factors strongly suggest that invidious discrimination was unlikely.'" *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).

For example, the fact that Plaintiff was hired when he was already 66 years old weighs against any age-based discriminatory animus. S.J. Ex. 27, ¶ 10; *see James v. New York Racing Ass'n*, 76 F. Supp. 2d 250, 255 (E.D.N.Y. 1999) *aff'd*, 233 F.3d 149 (2d Cir. 2000) ("the

inference of discrimination is much weaker where the plaintiff employee is well within the protected class when first hired."); *O'Connor v. Viacom Inc*., No. 93 Civ. 2399, 1996 WL 194299, at *7 (S.D.N.Y. Apr. 23, 1996) *aff'd*, 104 F.3d 356 (2d Cir. 1996).

Second, the "same actor inference" rule dictates against any inference of discrimination given that Plaintiff was hired and fired by Defendant Cahalan within a short 18-month span of time. *See* Cahalan Aff., ¶¶ 4, 118; S.J. Ex. 27, ¶¶ 10-11, 14, 43; *Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, "it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire."); *Schumacher v. Granite Services, Inc*., 2012 WL 951545 (N.D.N.Y. Mar. 20, 2012); *Restani v. HHS*, 2004 WL 437462 (N.D.N.Y. Feb. 9, 2004) *aff'd*, 144 F. App'x 197 (2d Cir. 2005); *Spadaro v. McKeon*, 693 F.Supp.2d 183, 188 (N.D.N.Y. 2010).

## C.     Plaintiff's Testimony Confirms That His Age Discrimination Claim Is Premised On Nothing But Speculation

Plaintiff's Complaint contains speculative and conclusory allegations that the Hospital "offered [Plaintiff] fewer benefits" and "subjected him to different and more aggressive scrutiny" of his performance than similarly situated, but younger, doctors. S.J. Ex. 19, ¶¶ 28-29. Plaintiff also alleges in his Complaint that other members of his former private practice (*i.e.,* Drs. Louis DiGiovanni and Christopher Gorczynski) received employment agreements with a five year term as compared to his three year contract. S.J. Ex. 19, ¶¶ 52; Cahalan Aff., ¶ 37.

Plaintiff illogically speculates that he was subjected to age discrimination because he had a few cases that were not "up to standards," and not because of anything relating to his age:

23

Q.      That's your word -- about your age. What concerns did they ever express again about your age, not about any medical or neurological conditions focusing –

A.      Right.

Q.      -- on age?

A.      Yes.

Q.      What concerns?

A.      The fact that I had a few cases that were not up to what they considered the standard, which I don't agree with, but in any event, they were concerned that I wasn't performing in their mind or in their -- what's the word I want? Not their mind, their -- what led up to all of this that I wasn't performing as well as the other surgeons.

Q.      My focus of the question is on the words of that sentence concerns about age. Where did the age part come into it?

A.      Well, I got a contract for three years rather than five years. Okay. Well, I mean--

Q.      Did the hospital ever –

A.      They didn't come up to me and say we're concerned about your age, we don't want you.  No, they never did that.

Kaufman Tr., pp. 29-30.

Plaintiff also plainly testified that he did not question or object to the length of his contract with his attorney, Joshua Levine, Esq., who negotiated the agreement on his behalf, or with Defendant Cahalan, who negotiated the agreement on behalf of the Hospital.  Kaufman Tr., pp. 143-144.  Plaintiff even admits that Mr. Levine simultaneously represented him and his former partner, Dr. Louis DiGiovanni, in negotiating an employment agreement with the Hospital. S.J. Ex. 27, ¶ 13. Having never previously questioned the length of his contract,

24

Plaintiff now alleges discrimination upon surmising that Dr. DiGiovanni received a longer contract term:

> Q.    And Doctor DiGiovanni had a five year employment contract?
>
> A.    I guess so. I don't have any proof of that, but I'm imagining he had a five year.

Kaufman Tr., p. 142.

Further, with regard to the length of his three year contract, Plaintiff did not testify that he wanted a five year contract.   Rather, Plaintiff testified that when he was in the midst of negotiating the Agreement it was his "thought that [he] was going to work for three years and then [he] was going to do IME's and settle out into some pasture somewhere…"   Kaufman Tr., p. 145.   Additionally, the financial figures received by the Hospital from Plaintiff's former private practice during the course of contract negotiations demonstrated that Plaintiff generated a significantly lower volume of patients and gross revenues compared to his partner, Dr. DiGiovanni, and former employee, Dr. Gorczynski.   Cahalan Aff., ¶ 35; S.J. Ex. 1.   Given such statistics, the Hospital reasonably believed it was not fiscally rational to offer Plaintiff a lengthy contract term.   Cahalan Aff., ¶ 35; *see e.g., Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 120, 946 N.Y.S.2d 27, 35 (1st Dep't 2012) (summary judgment granted where Hospital had non-discriminatory reasons for paying older physician less than younger subordinate physician).

## POINT III

## PLAINTIFF CANNOT ESTABLISH THAT
## DEFENDANTS' ACTIONS WERE PRETEXTUAL

Even if a *prima facie* case of age or disability discrimination could be established -- which it cannot -- the Hospital's substantiated legitimate and non-discriminatory reasons for

2025122v.12

terminating Plaintiff's employment (*i.e.,* his substandard clinical performance, high complication rate, malpractice history and serious threat to patient safety) cannot conceivably be deemed pretext for discrimination in the absence of any evidence to challenge the documented patient safety concerns.

This is particularly true in light of the Defendants' numerous efforts to work to maintain the relationship without jeopardizing patient safety. *See* Cahalan Aff., ¶¶ 49, 60-63; Kaufman Tr., pp. 5, 79-81, 111-112, 124-126. In that regard, Defendants:

- relieved Plaintiff from performing more complex surgical procedures with no pay reduction. Cahalan Aff., ¶ 60.

- relieved Plaintiff of his on-call assignments with no pay reduction. Cahalan Aff., ¶ 61; Kaufman Tr., p. 127; S.J. Ex. 27, ¶¶ 16-18.

- afforded Plaintiff a leave of absence to give him an opportunity to undergo recommended follow-up evaluations and provide clearance that he could safely return to work. Cahalan Aff., ¶ 77.

- while on leave, the Hospital advanced Plaintiff nearly $37,000 in vacation time benefits so that he continued to have a source of income. Cahalan Aff. ¶ 130; Kaufman Tr., pp. 96-97.

- extended Plaintiff's deadline to submit his application to renew his privileges beyond November 2009. Cahalan Aff., ¶ 112; Kaufman Tr., pp. 128-129.

In addition, Plaintiff:

- testified that Defendant Cahalan assisted him by writing a letter for Plaintiff's signature for purposes of being relieved of on-call responsibilities. Kaufman Tr., pp. 127-128, 151.

- testified that Defendant Cahalan assisted him in drafting a letter for purposes of extending his deadline to submit his application to renew his privileges. Kaufman Tr., pp. 128-129.

- in his handwritten notes dated December 17, 2009, summarizes a meeting he had with Defendant Cahalan in early June 2009, writing "we discussed my not doing large cases and not taking Emergency call, I said 'if I didn't

26

do these things what would happen to my pay?' Jay said 'nothing would change.'" *See* S. J. Ex. 36.

Thus, by Plaintiff's own account, Defendants strived to maintain the relationship despite his inability and failure to perform his contractual duties, thus negating any possible inference that the Hospital's reasons for either requiring Plaintiff to provide documentation that he could safely practice medicine and/or ultimately terminating Plaintiff's employment in the absence of such repeatedly requested information to protect patient safety, were pretextual.

In *Gross v. FBL Fin. Services, Inc.*, the Supreme Court has held that plaintiffs alleging age discrimination must also prove by a preponderance of the evidence that age discrimination was the "but-for" cause of the defendant's employment decision. 557 U.S. at 173; *see also Zuk v. Onondaga County*, 2011 WL 4344043; *Dieck v. Suffolk County Vanderbilt Museum*, 2011 WL 4434066 (E.D.N.Y. Sept. 22, 2011). Given Plaintiff's inability to establish that "but for" his age, the Hospital would not have taken the actions for which he complains, Plaintiff's age claim under the ADEA must be dismissed regardless of whether or not a *prima facie* burden is met. *Gross v. FBL Fin. Services, Inc.*, 557 U.S. at 177; *Zuk v. Onondaga County*, 2011 WL 4344043.

## POINT IV

### PLAINTIFF CANNOT ESTABLISH INDIVIDUAL LIABILITY AGAINST DEFENDANTS CAHALAN AND CHAPIN

Plaintiff's aider and abettor claims against Mr. Cahalan and Dr. Chapin under the NYSHRL should be dismissed because they cannot aid and abet their own actions, which Plaintiff alleges to give rise to this lawsuit. *See Medical Exp. Ambulance Corp. v. Kirkland*, 79 A.D.3d 886, 913 N.Y.S.2d 296 (2d Dep't 2010).

Moreover, as demonstrated above, Plaintiff has no viable discrimination claims against the Hospital that Mr. Cahalan or Dr. Chapin could have aided or abetted. Where "no violation of

27

Human Rights Law by another party has been established," there can be no individual liability for alleged aiding and abetting a violation of the Human Rights Law. *See Barbato v. Bowden*, 63 A.D.3d 1580, 1582, 880 N.Y.S.2d 817, 818-19 (4th Dep't 2009); *Dorvil v. Hilton Hotels Corp.*, 25 A.D.3d 442, 443, 807 N.Y.S.2d 369, 370 (1st Dep't 2006).

## POINT V

## PLAINTIFF'S BREACH OF CONTRACT CLAIM LACKS MERIT

Plaintiff's breach of contract claim, which is based on allegations that the Hospital breached its Medical Staff By-Laws ("By-Laws") by failing to provide him "with procedural rights," is improper and untimely. S.J. Ex. 19, ¶¶ 92, 116-117; S.J. Ex. 3. Plaintiff's claim fails, as a matter of law, because the Bylaws do not constitute a contract upon which a damages claim for breach may be asserted, absent specific language to that effect. *See Mason v. Cent. Suffok Hosp.*, 3 N.Y.3d 343, 348-49 (2004). Plaintiff fails to allege any section of the Bylaws that purportedly grants him any contractual right to damages, and a reading of the By-laws demonstrates that no such section exists. S.J. Ex. 3.

In addition, Plaintiff's claim is time-barred because the Hospital's alleged failure to follow its By-Laws must be brought as a claim for mandamus under Article 78 of New York's Civil Practice Law and Rules, which is subject to a four-month statute of limitations. *See* N.Y. C.P.L.R. 217; *see, e.g., Bickerstaff v. Vassar Coll.*, 354 F.Supp.2d 276, 283 (S.D.N.Y. 2004); *Pamilla v. Hosp. for Specialty Surgery*, 223 A.D.2d 508, 637 N.Y.S.2d 689 (1st Dep't 1996). Here, Plaintiff had to bring an Article 78 proceeding by no later than May 27, 2010, four months after his termination on January 27, 2010. S.J. Ex. 17. Because Plaintiff has failed to do so, Plaintiff's breach of contract claim based on an alleged violation of the Hospital's By-Laws is now time-barred.

2025122v.12

Moreover, New York State courts have upheld provisions in employment agreements, like Plaintiff's Agreement, which require physicians to surrender their medical staff privileges at a hospital upon termination without a fair hearing.  *See Sandhu v. Mercy Medical Center*, 35 A.D.3d 479, 828 N.Y.S.2d 91 (2d Dep't 2006); *see also Del Castillo v. Bayley Seton Hospital*, 172 A.D.2d 796, 569 N.Y.S.2d 168 (2d Dep't 1991); S.J. Exhibit 2, § 12.

## POINT VI

### DEFENDANTS ARE ENTITLED TO REIMBURSEMENT OF MONIES ADVANCED BASED ON THEORY OF UNJUST ENRICHMENT

"Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant."  *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009).

It cannot be disputed that the Hospital advanced Plaintiff unearned paid vacation benefits to provide him with a source of income while he was purportedly took leave to obtain the recommended neuropsychological follow-up evaluation and clearance to return to work. Cahalan Aff., ¶ 130; S.J. Ex. 27, ¶ 25.  It was anticipated that, upon Plaintiff's return to work, he would reimburse the Hospital by making up time that he was advanced.  *Id.*

Given that Plaintiff misrepresented to Defendants that he had not undergone the follow-up evaluation (Kaufman Tr., pp. 123-124; S.J. Ex. 11), and then concealed his physician's two separate written warnings that he could not safely return to practice (Kaufman Tr., pp. 55, 63, 72), equity and good conscience require Plaintiff to reimburse the Hospital for the unearned paid vacation benefits that he was advanced, which totals $36,678.  Cahalan Aff. ¶¶ 97, 126-131.

29

2025122v.12

## <u>CONCLUSION</u>

For the reasons set forth above, and as detailed in the Defendants' submissions accompanying this motion, Defendants respectfully request that the Court grant their motion for summary judgment and issue an Order dismissing the Amended Complaint in its entirety, granting the Hospital's counterclaim for unjust enrichment, and granting such other and further relief as the Court deems appropriate, including costs and attorneys' fees.

Dated:  Great Neck, New York
       March 19, 2013

By: _____ s/ Andrew L. Zwerling _____
Andrew L. Zwerling: Bar No: 514804
Marianne Monroy: Bar No.: 514811
Jason Hsi: Bar No: 514807
GARFUNKEL WILD, P.C.
*Attorneys for Defendants*
111 Great Neck Road, 6th Floor
Great Neck, New York 11021
Tel. (516) 393-2200
Fax (516) 466-5964
Email: azwerling@garfunkelwild.com
mmonroy@garfunkelwild.com
jhsi@garfunkelwild.com

2025122v.12