**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**STEWART A. KAUFMAN, M.D.,**

                                        **Plaintiff,**

        **vs.**                                            **1:11-CV-667**
                                                           **(MAD/DRH)**

**THE COLUMBIA MEMORIAL HOSPITAL, d/b/a**
**COLUMBIA MEMORIAL HOSPITAL, JAY P.**
**CAHALAN, individually, and NORMAN A.**
**CHAPIN, M.D., individually,**

                                        **Defendants.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**GLEASON, DUNN, WALSH & O'SHEA**          **RONALD G. DUNN, ESQ.**
40 Beaver Street                          **PETER N. SINCLAIR, ESQ.**
Albany, New York 1207
Attorneys for Plaintiff

**GARFUNKEL WILD, P.C.**                   **ANDREW L. ZWERLING, ESQ.**
111 Great Neck Road                       **JASON HSI, ESQ.**
Great Neck, New York 11201                **MARIANNE MONROY, ESQ.**
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff Stewart Kaufman, M.D. alleges that Defendants discriminated against him based

on his age in violation of the Age Discrimination and Employment Act of 1967, 29 U.S.C. §§

621- 634 ("ADEA") and the N.Y. Exec. Law § 296 ("New York State Human Rights Law" or

"NYSHRL") and further, that defendants discriminated against him on the basis of his disability

in violation of the Americans with Disabilities Act, ("ADA"), codified at 42 U.S.C. § 12101 _et_

_seq._ and the NYSHRL.  _See_ Dkt. No. 1.  Currently before the Court is Defendants' motion for

summary judgment.  Dkt. No. 40.  For the reasons stated herein, Defendants' Motion for

Summary Judgment is granted in part and denied in part.

## II.  BACKGROUND

Plaintiff Kaufman is an orthopedic surgeon residing in Columbia County, New York.

Dkt. No. 46-19 ("Plf's Resp. to Defs' Stmt. of Mat. Facts") ¶¶ 1-2.  Defendant Columbia Memorial

Hospital ("CMH") is a New York not-for-profit corporation.  *Id.* ¶ 3.  During the time period

relevant to Plaintiff's claims, Defendant Jay Cahalan was the Chief Operating Officer of CMH,

and Defendant Norman A. Chapin, M.D. was its Medical Director.  *Id.* ¶¶ 4-5.

In his Amended Complaint, Plaintiff alleges that the following medical conditions qualify

as a disability under applicable law: endoscopic surgery on his left knee (1981); surgery to correct

bilateral cataracts (1985); back surgery on his L4-5 vertebrate disc to stabilize degenerative disc

disease and stenosis of the foramina ("Spinal Condition") (1996); splenectomy and chemotherapy

for small cell lymphoma (1997); laparotomy and chemotherapy for large cell lymphoma (2001);

back surgery on his L2-3 and L4-5 vertebrate discs to further stabilize the Spinal Condition

(2006); surgery to correct carpal tunnel syndrome (2009); and sleep apnea treated by a

Continuous Positive Airway Pressure ("CPAP") device (2009).  Dkt. No. 4 ¶¶ 58-68; 98-100.

Prior to his employment at CMH, Plaintiff and his partner, Dr. Louis DiGiovanni,

practiced medicine through their own private orthopedic practice, Hudson Valley Orthopedic

Associates, P.C.  Plf's Resp. to Defs' Stmt. of Mat. Facts ¶ 15.  Plaintiff and CMH entered into a

three-year employment agreement on June 6, 2008; Plaintiff was 66 years old at the time.  *Id.* ¶

19.  Dr. DiGiovanni also signed an employment contract with CMH, the length of which was five

years.  Both Plaintiff and Dr. DiGiovanni were represented by any attorney, Joshua Levine,

during the negotiation of their employment agreements with CMH; Defendant Cahalan

represented CMH.  *Id.* ¶ 17.

      With respect to the length of his contract, Plaintiff testified:

> Q:  What did you do after you found out that Doctor DiGiovanni
> according to you had a five year contract?
>
> A:  Nothing.
>
> Q:  Did you call up Josh Levine and say, hey, what's up?
>
> A:  No, because I thought that I was going to work for three years
> and then I was going to do IME's [independent medical exams] and
> settle out into some pasture somewhere, but obviously, that was not
> the intention of the contract.
>
> Q:  So it was your thought to retire from the hospital after three
> years anyway?
>
> A:  No. I was going to just pare back my practice significantly and
> take care of some of the stuff that nobody else likes to do.
>
> . . .
>
> Q: But when you found out according to you during that time frame
> that doctor DiGiovanni apparently had a five year contract, rather
> than complain you just figured at the end of three years you would
> just stop employment with the hospital and do IME's?
>
> A:  No, maybe still work for the hospital.  I believe we were talking
> about working for the hospital just as I said seeing patients that take
> up a lot of time and don't really produce anything and need to be
> seen.

Dkt. No. 40-21 ("Kaufman Dep.") at p. 145-46.

      At the time he was hired, Plaintiff believed that each of the conditions he now claims

should be considered in determining whether he was disabled were known to CMH, except for

sleep apnea.  Plf's Resp. to Defs' Stmt. of Mat. Facts ¶ 31.  Plaintiff's sleep apnea condition was

diagnosed and successfully treated in 2009 while Plaintiff was on leave from CMH.  *Id.* ¶ 32.

Following the end of his employment at CMH, Plaintiff remained able to work, and continued to do so by performing independent medical examinations. *Id.* ¶ 38.

On March 18, 2009, CMH officials met with Plaintiff to discuss his rate of revision for total knee replacement surgeries. *Id.* ¶ 40. CMH officials presented Plaintiff with data which purported to show by comparison that Plaintiff's rate of revision was higher than his counterparts at CMH. Dkt. No. 40-6. Plaintiff now contends that these data are misleading because he performed a number of revisions on patients for whom he did not perform the original procedure. Plf's Resp. to Defs' Stmt. of Mat. Facts ¶ 39. During that meeting, CMH also notified Plaintiff that certain operating room staff members had reported that his focus and stamina in the operating room was poor, and had made complaints about his performance during surgery. *Id.* ¶ 41. Plaintiff was relieved of total knee replacement surgeries, and he agreed to undergo additional training and review his prior cases with colleagues. *Id.* ¶ 43.

In or about July 2009, CMH officials met with Plaintiff to discuss the duration of two or three of his hip surgeries, which they contended were longer than the national average. *Id.* ¶ 44. Plaintiff now claims, upon information and belief, that other surgeons at CMH had hip surgeries that were longer than the national average. Dkt. No. 46-1 ("Kaufman Decl.") ¶ 30. In or about Spring 2009, Plaintiff ceased performing large joint surgeries. Plf's Resp. to Defs' Stmt. of Mat. Facts ¶ 45.[1]

Later in July 2009, Plaintiff was referred by CMH to neuropsychologist Aaron Philip Nelson, Ph.D for a neuropsychological examination. Dr. Nelson evaluated Plaintiff and issued a report dated July 22, 2009. Dkt. No. 40-8 ("Nelson Report"). In his report, Dr. Nelson stated:

---

[1] Defendants claim that Plaintiff voluntarily ceased these surgeries, while Plaintiff claims he was coerced to do so by Defendants. *Id.*

4

I had the opportunity of seeing Stewart Kaufman for Neuropsychology evaluation. As you know, he is a 67 year old physician with a complex medical history referred due to concerns regarding his capacity to continue to practice as an orthopedic surgeon.

I reviewed the context of the evaluation with Dr. Kaufman at the start of the interview.  Specifically, I reviewed with him the fact that I had been asked to perform this evaluation by his Medical Director because of concerns that had been raised regarding his ability to practice. I indicated that the evaluation was not occurring as a part of his medical care. I also informed Dr. Kaufman that I would be preparing a report and communicating directly with Dr. Chapin regarding my findings and impression. Dr. Kaufman indicated that he understood and accepted these conditions.

With regard to his understanding of how concerns regarding his performance came about, Dr. Kaufman indicated that "somebody suggested I have poor judgment." He mentioned a review of his total knee replacement surgeries that revealed an elevated frequency of re-do procedures. He subsequently learned that the technique he had been utilizing had been out of favor in the surgical community. He explained that he had not known that the technique had been discontinued until the review occurred. A review of his total hip replacement procedures indicated a longer than average surgical time; he attributed this to the physically strenuous nature of the procedure (and his back pain) and discontinued performing this operation. He continues to treat hip fractures and take call. He also continues to perform knee scope, shoulder scopes, carpal tunnel surgery and other smaller scale cases that do not place as much of a physical strain on his back. He estimates that he does 4-6 cases per week. He tells me that he has 2 years remaining on his contract with the hospital and that he is considering stepping back from procedures altogether at that point, perhaps doing chart reviews etc instead.

. . .

IMPRESSION: In summary, this is a 67 year old physician with a complex medical history referred due to concerns regarding his capacity to continue to practice as an orthopedic surgeon. Baseline intellectual ability is estimated in the superior range. The neuropsychological examination reveals variability in the sphere of attention and executive function. Performance on measures of simple attention span were in the average range; I suspect these scores are considerably lower than his optimal baseline. He was

unable to contend with the WCST, a task entailing nonverbal reasoning and responsivity to corrective feedback. He exhibited a deficit in sustained attention on the Connors CPT and made errors on tasks of response inhibition (Go/No Go) and complex motor programming.  Performance on measures of anterograde memory was excellent with the exception of the RAVLT, a test entailing learning and memory for a list of words.  His learning curve was quite shallow and he made a large number of within-trial repetitions, again implicating problems with self-monitoring. Performance on measures of manual motor speed and dexterity were suggestive of diminished agility with the left hand. It is certainly possible that the fine motor findings are related to a chemotherapy-induced peripheral neuropathy.

The etiology of these findings is uncertain. He has certainly had a rugged medical course over the past 12 years or so with bouts of small and large-cell lymphoma, a stem cell transplant, prostate surgery with complications, several spine surgeries, and a cardiac arrhythmia. He has been treated with multiple cycles of CHOP chemotherapy (cyclophosphamide, adriamycin, vincristine, and prednisone) plus Rituxan. Although we do not know a lot about the long-term effects of these drugs, there is reason to suspect that they may convey some degree of neurotoxicity in addition to cerebrovascular compromise through cardiac effects.

The overall topography of the examination implicates frontal / subcortical brain systems and is commonly seen in a setting of ischemic vascular disease. He has never had a brain imaging study to my knowledge so I have no basis for making this diagnosis in anything more than a speculative fashion. To be thorough, these findings can also be seen in a context of depression, adverse medication side effects, or in any setting in which attentional systems are undermined. I should add that there is no history of depression (per his report) and he flatly denies current symptoms along these lines as indicated by his score of zero on the BDI-II.

Regardless of the basis, these findings are concerning with respect to Dr. Kaufman's ability to sustain attention and focus over extended periods of time. To the extent that his work involves this type of sustained concentration, the examination does have adverse implications for his current capacity to practice. It is my opinion that his practice should be closely monitored at this time.

*Id.*

On August 10, 2009, Plaintiff met with CMH officials to discuss the Nelson Report. During this meeting, Plaintiff was informed that he should take a leave of absence until CMH received the results of the recommended follow-up consultation and confirmation that he was successfully treated for any conditions affecting his performance.  Plf's Resp. to Defs' Stmt. of Mat. Facts ¶ 55.  Plaintiff requested that his practice be monitored, as suggested by Dr. Nelson, rather than take a leave of absence.  *Id.*  While on leave, CMH paid Plaintiff $37,000 in vacation and paid benefit time credits.  *Id.* ¶ 56.

Plaintiff and CMH officials met again on August 24, 2009, to discuss questions concerning Dr. Nelson's report.  Thereafter, Defendant Chapin emailed Dr. Nelson, with a copy to Plaintiff, to raise these clarifying questions.  Dr. Nelson wrote an email dated August 25, 2009, to further explain his findings:

> In terms of extended periods of time, the concerns arising from my findings relate to both attentional focus within the moment and across the day.  What I mean is that your performance on testing raised concerns about your ability to mount and sustain effective attention to a task at hand.  In addition, we know that fatigue will amplify this type of problem over the course of hours or a day.  This is why I recommended close monitoring of your practice.  In terms of the specifics of this monitoring, I expect this would be a process devised by your clinical chief in which you would be directly observed at work until your chief was confident that you were performing acceptably.  I cannot parse it any finer than this and I can only say that this was my recommendation.

Dkt. No. 40-9.

On August 26, 2009, Plaintiff's own physician, Albert M. Galaburda, M.D. diagnosed Plaintiff with mild microvascualar change in the brain.    Plf's Resp. to Defs' Stmt. of Mat. Facts ¶ 57.  In an August 27, 2009, follow-up email exchange, Plaintiff raised several questions to which Dr. Galaburda provided the following responses:

[Q:] Is my MRI consistent with my age and considered WNL [within normal limits] in that context or could it contribute to my current attention problem?

[A:] NO.  YOU HAVE MICROVASCULAR DISEASE, NOT SEVERE, BUT IN COMBINATION WITH OTHER FACTORS IT COULD MAKE YOU MORE VULNERABLE TO HAVE COGNITIVE CHANGES.

. . .

[Q:] Between now and our next visit, would you think that I should be able to see patients in the office?  The way this happens is as follows: visits of five to ten minutes where the findings are recorded on a template.  I would not operate.

[A:] I DO NOT THINK YOU SHOULD PRACTICE MEDICINE OF ANY TYPE UNTIL WE GET THE RESULTS OF THE SLEEP EVALUATION, FIND OUT WHETHER YOU DO HAVE APNEA OR OTHER SLEEP ABNORMALITY, AND SEE WHETHER YOUR OXYGEN DESATURATES DURING SLEEP.

Dkt. No. 40-32.

At an August 28, 2009, meeting attended by Plaintiff, his wife, Defendant Cahalan and Defendant Chapin, CMH continued to insist that Plaintiff pursue the follow-up neurological testing recommended by Dr. Nelson.  CMH expressed its concerns that in light of the prior concerns expressed by CMH staff regarding Plaintiff's performance, the Nelson Report, and a recent "biceps tendon case," permitting Plaintiff to resume his practice could expose CMH to liability.  Plaintiff requested that CMH permit a physician's assistant to supervise his work, as suggested by Dr. Nelson.  Cahalan and Chapin stated that CMH would be unwilling to make such an accommodation.  They also indicated to Plaintiff that his contract could be terminated if CMH determined that Plaintiff "could be a danger to himself or others or a hospital patient."  Dkt. No. 40-38.

8

In September 2009, Plaintiff was referred by Dr. Galaburda to Jacqueline Chang, M.D., who diagnosed Plaintiff with severe obstructive sleep apnea and began treatment with a CPAP device. Dkt. Nos. 40-33; 40-34; 40-35. On December 3, 2009, Plaintiff had another appointment with Dr. Galaburda, during which Dr. Galaburda noted that, as a result of the CPAP treatment:

> [h]e states that he is much more rested. Previously, he'd fall asleep in the car as a passenger, and could not read more that [sic] a few minutes without falling asleep. He did not fall asleep during the whole ride from NY State [to Boston] and now he can read for hours. . . .
>
> He claims that now that his sleep apnea is treated, he should be allowed to see medical type patients, and he agrees that he does not have to do surgery. However, when he describes what the job entails, what the responsibilities are, and what the cognitive challenges are in seeing patients in the office, he doesn't seem to understand them. . . .
>
> We have a long conversation about his options. I recommend that he wait 2-3 more months and repeat the NP evaluation with Dr. Nelson at BWH, who did his initial evaluation. He will continue to be followed by the Sleep Unit and continue to use the CPAP machine. Even though he is reporting a good result, he tends to minimize his symptoms and will need to have some objective measure of his sleep apnea with treatment. I will see him again in two months, but I do not recommend that he go back to work as a doctor now.

Dkt. No. 40-35. At no time prior to his termination did Plaintiff inform CMH of the results of Dr. Chang's and Dr. Galaburda's diagnoses and impressions. Kaufman Dep. at p. 62-63; 66-67; 72-73.

Plaintiff's Medical Staff privileges at CMH were due to be renewed in November 2009. Plaintiff did not reapply for those privileges during November and they expired on November 30, 2009. Plaintiff requested an "extension" of that deadline, to which CMH responded that it was unable to do under the Medical Staff By-Laws, and further stated that any application for such privileges would be subject to the same review process that was in place for Plaintiff's

9

reinstatement.  That is, CMH insisted that Plaintiff seek evaluation from a neurologist, as

recommended by Dr. Nelson, and any necessary treatment.  Dkt. No. 40-17.  In an email to CMH

officials, Plaintiff recognized that such application would only be accepted by CMH following

satisfactory consultation with a neurologist: "Please send me the necessary packet, I will complete

it and send it back, pending the result of my appointment with the neurologist, after my

recuperation."  Dkt. No. 40-14.

In November and December 2009, Plaintiff requested that CMH accommodate him by

allowing one-on-one monitoring by a third-party orthopedist.  Dkt. No. 40-15.  In response,

Defendant Cahalan stated that what Dr. Nelson had recommended "was proximate supervision

similar to that which would be provided to a 'resident.'  The scenario you described seemed more

like a check off of competencies and does not address the concerns we have.  In any event, we do

not view the use of a monitor as a practical, feasible or acceptable solution."  Dkt. No. 40-16.

On January 18, 2010, Plaintiff submitted a re-application for Staff Privileges at CMH.

Dkt. Nos. 40-18; 40-19.  At that time, Plaintiff had not provided any records reflecting a follow-

up medical assessment, as recommended by Dr. Nelson and as required by CMH.

Pursuant to Plaintiff's Employment Agreement with CMH, his employment could be

"terminated without prior written notice at any time by the Hospital for just cause, including, but

not limited to: . . . (ii) A termination, suspension or non-renewal of your medical staff privileges

at the Hospital in accordance with the medical staff bylaws, rules and regulations and policies of

the Hospital. . . .  (viii) Other conduct which in the fair and reasonable opinion of the President

(or designee(s) of the Hospital) is such as to create a threat to the health, safety or welfare of

patients, demonstrates a failure to carry out your professional responsibilities hereunder, or is

otherwise contrary to the best interest and welfare of the Hospital and its patients."  Dkt. No. 40-4

("Employment Agreement") § 11.

By letter dated January 27, 2010, CMH terminated Plaintiff.  The termination letter stated,

in pertinent part:

> This letter will serve as formal notice that [CMH] has elected to exercise its right to terminate your employment with the Hospital pursuant to Sections 11(b)(ii) and 11(b)(viii) of the Agreement.
>
> As you are aware, you failed to reapply to renew your membership in the Hospital's Medical Staff.  In addition, you have failed to provide the Hospital with a follow up medical assessment satisfactory to the Hospital, despite several requests by the Hospital.
>
> Therefore, in accordance with the terms of the Agreement, your employment by the Hospital shall terminate effective the date of this letter.  As discussed, your medical staff membership and privileges previously lapsed and, in any event, terminate concurrently with the Agreement.  There is no unpaid compensation due to you.

Dkt. No. 40-19.

Thereafter, Plaintiff exhausted his administrative remedies with the EEOC and NYHRC,

and subsequently filed the instant lawsuit.

### III.  DISCUSSION

**A.   Summary Judgment Standard**

A court may grant a motion for summary judgment only if it "determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the moving party as a matter of law."  *Chambers v. TRM Copy Ctrs. Corp.*,

43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion,

the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"

*Id.* at 36-37 (citation omitted).  Moreover, it is well-settled that a party opposing a motion for

summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citing Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

**B.     Summary Judgment Standards for Employment Discrimination Cases**

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "because direct evidence of an employer's discriminatory intent is rare and 'must often be inferred from circumstantial evidence.'" *Serby v. New York City Dep't of Educ.*, No. 09-CV-2727, 2012 WL 928194, *5 (E.D.N.Y. Mar. 19, 2012) (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006)). However, "'[s]ummary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 Fed. Appx. 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), superseded by statute on

other grounds as stated in *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282

(S.D.N.Y. 2006)).  Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate

even in the fact-intensive context of discrimination cases.'"  *Feingold v. New York*, 366 F.3d 138,

149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.

2001)).  Furthermore, "[e]ven in the discrimination context . . . a plaintiff must provide more than

conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137

(citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).  A "nonmoving party 'must offer some

hard evidence showing that its version of the events is not wholly fanciful.'"  *Jeffreys v. City of*

*New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *D'Amico v. City of New York*, 132 F.3d 145,

149 (2d Cir. 1998)).  "If the evidence [presented by the non-moving party] is merely colorable, or

is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).  The Second Circuit has held that:

> In discrimination cases, the inquiry into whether the plaintiff's sex
> (or race, etc.) caused the conduct at issue often requires an
> assessment of individuals' motivations and state of mind, matters
> that call for a sparing use of the summary judgment device because
> of juries' special advantages over judges in this area.  Nonetheless,
> an employment discrimination plaintiff faced with a properly
> supported summary judgment motion must do more than simply
> show that there is some metaphysical doubt as to the material facts.
> She must come forth with evidence sufficient to allow a reasonable
> jury to find in her favor.

*Brown v. Henderson*, 257 F.3d 246, 251-52 (2d Cir. 2001) (citations and quotations omitted).

"[S]ummary judgment may not be granted simply because the court believes that the

plaintiff will be unable to meet his or her burden of persuasion at trial.  There must either be a

lack of evidence in support of the plaintiff's position, or the evidence must be so overwhelmingly

tilted in one direction that any contrary finding would constitute clear error."  *Danzer v. Norden*

*Sys. Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted).  "Nonetheless, when an

employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citation omitted); *see also Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) (same); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (same).

## C.     The *McDonnell Douglas* Standard

Each of Plaintiff's claims are evaluated pursuant to the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  *Ben-Levy v. Bloomberg, L.P.*, 518 Fed. Appx. 17, 18-19 (2d Cir. 2013); *see also Holowecki v. Federal Exp. Corp.*, 382 Fed. Appx. 42, 45 n.2 (2d Cir. 2010) (applying *McDonnell Douglas* to ADEA discrimination claims); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105-06 (2d Cir. 2010) (applying *McDonnell Douglas* to ADEA and NYSHRL discrimination claims); *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (applying *McDonnell Douglas* to ADA discrimination claims); *Kemp v. Metro-North R.R.*, 316 Fed. Appx. 25, 26-27 (2d Cir. 2009) (applying *McDonnell Douglas* to ADA and NYSHRL discrimination claims).

> Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  411 U.S. at 802, 93 S.Ct. 1817.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action.  *Id.*  Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination.

*Gorzynski*, 596 F.3d at 106.  To rebut the articulated justification for the adverse action, "the plaintiff must show both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4 (1993) (internal quotations omitted).  This

14

burden-shifting analysis informs the ultimate determination of whether the evidence reasonably

supports an inference of the facts plaintiff must prove. *James v. New York Racing Ass'n*, 233 F.3d

149, 157 (2d Cir. 2000).

Following the Supreme Court's decision in *Gross v. FBL Financial Services*, 557 U.S. 167

(2009), "'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a

preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse

employment action' and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106

(quoting *Gross*, 557 U.S. at 180).  However, the *Gross* "but-for" standard does not apply to the

ADA and NYSHRL disability discrimination claims.  Second Circuit precedent prior to *Gross*

held that a plaintiff may raise a triable issue of pretext based on a "mixed-motive" theory – that

disability discrimination was a "motivating factor" of plaintiff's termination.  *Parker v. Columbia

Pictures Indus.*, 204 F.3d 326, 336-37 (2d Cir. 2000).  Recent decisions have confirmed that

different standards apply to the pretext inquiry for ADEA and ADA claims.  *See e.g.*, *Ben-Levy v.

Bloomberg, L.P.*, 518 Fed. Appx. 17, 18 n.1 (2d Cir. 2013) (noting that different standards apply

to ADA and ADEA claims but finding that such difference was not pertinent to the outcome in

the instant case); *Najjar v. Mirecki*, No. 11 Civ. 5138, 2013 WL 3306777, *7 n.5 (S.D.N.Y. July

2, 2013) (observing that "no Second Circuit case has applied *Gross* to ADA claims" and declining

to do so *sua sponte*).

**C.     Analysis**

Defendants argue that Plaintiff cannot establish a prima facie case for either his disability

or his age discrimination claims and, in any event, he cannot establish that Defendants' non-

discriminatory justifications for their actions were pretextual.  Defendants also argue that Plaintiff

cannot establish liability as to individual Defendants Cahalan and Chapin.  Defendants next

contend that Plaintiff's breach of contract claim based upon CMH's alleged failure to abide by the Medical Staff By-Laws lacks merit and is time-barred.  Finally, Defendants seek summary judgment on their unjust enrichment counterclaim.

### 1.    ADA and NYSHRL Disability Discrimination Claims

In order to make out a prima facie case of disability discrimination, the plaintiff must demonstrate that

> (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability.

*Kinneary v. City of New York*, 601 F.3d 151, 156 (2d Cir. 2010) (quoting *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d. Cir. 2005)).  "The elements of a prima facie case for discrimination prohibited by the NYSHRL are the same as a claim under the ADA[.]"  *Starr v. Time Warner, Inc.*, No. 07 Civ. 5871, 2007 WL 4144627, *6 (S.D.N.Y. Nov. 21, 2007).

With respect to Plaintiff's burden to show a prima facie case of disability discrimination, Defendants first argue that Plaintiff is not disabled within the meaning of the ADA.  The ADA defines "disability" as: "A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; B) a record of such an impairment; or C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  Defendants contend that Plaintiff cannot establish that he is disabled under any of these provisions.

Under the ADA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  "An individual meets the requirement of 'being regarded as having such

an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

Having reviewed the record, the Court finds that there is evidence substantiating a number of impairments, which Plaintiff claims limits one or more of his major life activities, sufficient to raise a question of fact with respect to this issue. Indeed, Defendants themselves assert elsewhere that one or more of these impairments (*e.g.*, the Spinal Condition and/or sleep apnea) affected Plaintiff's capacity for endurance, concentration, thinking, and working. Thus, it is clear that a reasonable jury could conclude that Plaintiff was disabled within the meaning of the ADA and NYSHRL.

Defendants next argue that Plaintiff was not otherwise qualified to perform the essential functions of his job as an orthopedic surgeon. In order to make this determination, the Court must conduct a two-part analysis. First, it must be determined "whether the plaintiff can perform the essential functions of a particular job despite his handicap, and if not, whether the employer could reasonably accommodate the employee so that he could perform the essential functions despite his handicap." *Husowitz v. Runyon*, 942 F. Supp. 822, 833 (E.D.N.Y. 1996).

"A disabled individual is not 'otherwise qualified' for a particular employment position if such individual poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Adams v. Rochester Gen. Hosp.*, 977 F. Supp. 226, 233 (W.D.N.Y. 1997) (citing *Altman v. N.Y.C. Health and Hosps. Corp.* 903 F. Supp. 503 (S.D.N.Y. 1995), *aff'd*, 100 F.3d 1054 (2d Cir. 1996)).

As an initial matter, the Court notes that neither Defendants nor Plaintiff have presented evidence or argument regarding what the essential functions of Plaintiff's job were as an orthopedic surgeon CMH.  Thus, it is impossible for the Court to determine whether Plaintiff could perform those functions, with or without reasonable accommodation.  Nevertheless, the Court is persuaded that a substantial question of fact exists regarding whether Plaintiff was otherwise qualified.  Most importantly, the Court notes (as Defendants have pointed out) that Plaintiff continued to perform independent medical examinations following his termination by CMH through his private practice.

In addition, there is evidence in the record that Plaintiff repeatedly requested the accommodation, as recommended by Dr. Nelson, of having his practice monitored.  While Defendants argue that such an accommodation would not have been reasonable under the circumstances, it appears that Plaintiff's requests were never seriously considered by CMH and, in any event, whether such accommodations were reasonable or would impose undue hardship on CMH is a question for a jury to decide.

With respect to the last step of Plaintiff's prima facie case, Defendants do not contest that Plaintiff suffered an adverse employment action.  Defendants argue that Plaintiff failed to show that he suffered an adverse employment action *because of* his disability.  More specifically, Defendants argue that Plaintiff has not met his burden because he has made only conclusory, unsupported assertions regarding his disparate treatment, as compared to other non-disabled doctors.  Moreover, Plaintiff has admitted that CMH was aware of each of his medical conditions at the time it hired him, except for the sleep apnea condition, which was diagnosed and successfully treated while Plaintiff was on leave from CMH.

"In order to meet this burden a plaintiff must introduce sufficient evidence showing that she was terminated under circumstances giving rise to an inference of discriminatory intent." *Mines v. City of New York/DHS*, No. 11 CV 7886, 2013 WL 5904067, *10 (S.D.N.Y. Nov. 4, 2013). "Discriminatory intent may be inferred from the totality of the circumstances, including . . . the historical background of the decision . . . ; the specific sequence of events leading up to the challenged decision . . . ; [and] contemporary statements by members of the decisionmaking body." *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (citation omitted). In establishing a prima facie case under the ADA, the plaintiff cannot rely solely on conclusory allegations of discrimination without any concrete evidence to support her claims. *See Cameron v. Cmty. Aid for Retarded Children*, 335 F.3d 60, 63 (2d Cir. 2003).

To meet his burden on this issue, Plaintiff here asserts that the "timing and context" of Defendants' actions demonstrate discriminatory intent, that Defendants treated Plaintiff differently than other non-disabled physicians, that Defendants believed that Plaintiff suffered from a cognitive impairment which posed a risk to his patients, and that Defendants hired a replacement physician who was not disabled. The Court has carefully reviewed the record and finds that each of these assertions are conclusory and unsupported by concrete evidence. Plaintiff has offered no explanation of *how* the timing and context of Defendants' actions give rise to discriminatory intent. Moreover, despite extensive discovery, Plaintiff also fails to specifically identify any non-disabled, similarly situated physicians who were treated differently than him, or that were hired by CMH after his termination.

The Court is also unpersuaded by Plaintiff's argument that Defendants' stated position that they were concerned Plaintiff's impairments could result in risk of harm to his patients gives rise to an inference of discrimination. If anything, this statement militates against an inference of

discrimination and toward a finding that Defendants had legitimate concerns regarding Plaintiff's capacity to continue practicing as an orthopedic surgeon.  For the foregoing reasons, the Court finds that Plaintiff has failed to meet his burden of proof on this issue, and thus, has not made out a prima facie case on his disability discrimination claims.  Accordingly, Defendants motion for summary judgment on Plaintiff's disability discrimination claims is granted.

### 2.      ADEA and NYSHRL Age Discrimination Claims

"In order to establish a prima facie case of age discrimination, [a plaintiff] must show (1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination."  *Gorzynski*, 596 F.3d at 107 (citation omitted).

Plaintiff claims that he was discriminated against by CMH by giving him an employment agreement that was shorter than those given to his younger peers, placing him on paid leave, denying his application for Medical Staff privileges, and terminating his employment.

With respect to Plaintiff's burden to show a prima facie case of age discrimination, Defendants make several of the same arguments made in support of dismissal of his disability discrimination claims.  First, Defendants argue that Plaintiff was not otherwise qualified for his position.  For the reasons discussed above, a substantial question of fact exists with respect to this issue.

Defendants also argue that Plaintiff has failed to meet his burden of demonstrating circumstances giving rise to an inference of discrimination.  In response, Plaintiff makes many of the same conclusory arguments already rejected by the Court with respect to his disability discrimination claims.  However, Plaintiff does point to an additional set of factual circumstances

unique to his age discrimination claim.  Plaintiff argues that the fact that he was offered a three-year contract by CMH at the same time that it offered his younger partner Dr. DiGiovanni a five-year contract gives rise to an inference of discrimination.  Although Defendants contend that they had legitimate reasons for this decision, those contentions are not appropriately considered at this stage of the analysis.  For now, Plaintiff has adduced facts sufficient for a reasonable jury to conclude that he was offered a shorter-term contract than his younger counterpart because of CMH's age discrimination.  Accordingly, Plaintiff has met his prima facie burden on his age discrimination claims to the extent they arise from CMH's decision to offer him a three-year employment contract.

Under *McDonnell Douglas*, the burden now shifts to Defendants to articulate some legitimate, nondiscriminatory reason for its decision to offer Plaintiff a three-year contract, rather than a five-year contract, as it offered to his younger counterpart.  Defendants contend that during negotiations of the respective employment agreements with Plaintiff and Dr. DiGiovanni, financial figures were provided by their practice, Hudson Valley Orthopedic Associates, to CMH for review.  Defendants argue that these figures reflect that Plaintiff generated lower revenues and patient volumes compared to his partner, Dr. DiGiovanni, as well as their employee Dr. Gorczynski.  This disparity, Defendants contend, is a legitimate, non-discriminatory basis for their offer of a shorter term to Plaintiff.  Dkt. No. 40-2 ¶¶ 35, 38.  Moreover, Defendants contend, the agreements reflected the intentions of the parties, insofar as Plaintiff and Dr. DiGiovanni had different long-term goals.  "With regard to Dr. Kaufman, it was represented and understood that Dr. Kaufman likely intended to decrease the scope of his surgical/clinical responsibilities within a few years and have an increased non-surgical and office-based practice."  *Id.* ¶ 34; *see also* Kaufman Dep. at p. 145-46 ("I thought that I was going to work for three years and then I was

going to do IME's [independent medical exams] and settle out into some pasture somewhere"). Defendants have thus articulated one or more legitimate, non-discriminatory reasons for their conduct.

The burden now shifts back to Plaintiff to show that the articulated justifications were pretextual, and that age was the "but-for" cause of the challenged adverse employment action and not just a contributing or motivating factor. Here, "Plaintiff has proffered no evidence showing that Defendants' stated reasons are merely pretextual and that age discrimination was [the] reason for the adverse employment action." *Elfenbein v. Bronx Lebanon Hosp. Ctr.*, No. 08 Civ. 5382, 2009 WL 3459215, *6 (S.D.N.Y. Oct. 27, 2009) (quotation and citation omitted). For instance, Plaintiff has not produced evidence to counter Defendants' contention that his gross revenues and patient volume in private practice were lower than his partner's and their employee's. *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 470 (2d Cir. 2001) (finding that plaintiff had "failed to produce any evidence to suggest that [the employer's] stated financial rationale was pretextual").

Plaintiff has also failed to rebut Defendants' claim that a three-year term reflected the intentions of the parties, and specifically, Plaintiff's desire to change the nature of his practice after three years. By way of example, Plaintiff has not argued that he sought, and was denied, a contract term longer than three years. Nor has Plaintiff adduced evidence which demonstrates a desire on his part to continue performing all of his duties as an orthopedic surgeon more than three years after he signed the Employment Agreement. Thus, Plaintiff has failed to meet his ultimate burden of showing that he was treated adversely on account of his age. Accordingly, Defendants' motion for summary judgment on Plaintiff's age discrimination claims is granted.

### 3. Defendants Cahalan's and Chapin's Individual Liability

22

For the reasons discussed above, the Court has granted Defendants' motion for summary judgment as to Plaintiff's age and disability discrimination claims, thereby dismissing Plaintiff's claims under the NYSHRL.  Defendants correctly argue that Plaintiff's individual claims against Defendants Cahalan and Chapin must likewise be dismissed.  "Where no violation of the Human Rights Law by another party has been established, . . . an individual employee cannot be held liable for aiding or abetting such a violation."  *Strauss v. New York State Dep't of Educ.*, 26 A.D.3d 67, 73 (3d Dept. 2005).  Notably, Plaintiff has not opposed this aspect of Defendants' motion.  Accordingly, Defendants' motion for summary judgment on Plaintiff's claims against Defendants Cahalan and Chapin individually is granted.

### 4.    Breach of Contract Claim

Plaintiff claims that Defendants breached the Employment Agreement for terminating him without just cause and without adhering to the Fair Hearing Plan that is part of CMH's Medical Staff By-Laws.  Defendants argue that to the extent Plaintiff's breach of contract claim is based upon breach of the Medical Staff By-Laws, the claim fails as a matter of law and is untimely.

Relying on *Mason v. Cent. Suffolk Hosp.*, 3 N.Y.3d 343 (2004), Defendants argue that New York state law does not recognize hospital bylaws as a contract for breach of which a doctor may sue.  However, the Court of Appeals in *Mason* explicitly acknowledged situations where, as here, bylaws may constitute a contract:

> This does not mean, of course, that the hospital may not expose itself to such liability if it chooses to do so. A clearly written contract, granting privileges to a doctor for a fixed period of time, and agreeing not to withdraw those privileges except for specified cause, will be enforced.

*Id.* at 348-49.

Plaintiff correctly argues that the Employment Agreement explicitly incorporates the Medical Staff By-Laws by reference.  More specifically, Section 11(b)(ii), one of the sections pursuant to which Plaintiff was terminated, provides that the Employment Agreement may be terminated as a result of: "[a] termination, suspension or non-renewal of your medical staff privileges at the Hospital in accordance with the medical staff bylaws, rules and regulations and policies of the Hospital."  Employment Agreement § 11.  Moreover, the Employment Agreement required Plaintiff to abide by the bylaws: "[a]s a condition of your employment hereunder, you agree at all times to comply with the bylaws, rules and regulations of the Hospital and its Medical Staff."  *Id.* § 13.  Thus, the bylaws were incorporated by reference into Plaintiff's Employment Agreement.  *See NE Georgia Radiological Assocs., P.C. v. Tidwell*, 670 F.2d 507, 511 (5th Cir. 1982) (finding that contract between radiologist's private practice and hospital incorporated medical bylaws by reference sufficient to give rise to property interest in staff privileges); *MacManus v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, No. 1:08-cv-96, 2008 WL 2115733, *4 (E.D. Tenn. May 19, 2008) (concluding that "[t]he Medical Staff Bylaws are incorporated by reference into Plaintiff's employment contract").

As noted by Plaintiff, "[t]he bylaws include a due process procedure, referred to as the 'Fair Hearing Plan', to determine just cause when a physician is subject to 'reduction, suspension, or revocation of clinical privileges, or for suspension or expulsion from the Medial Staff.'"  Dkt. No. 46-18 at 31 (quoting Medical Staff By-Laws, Appendix A).  Defendants have not contested Plaintiff's allegation that no such process was afforded to Plaintiff.  Accordingly, Defendant's motion for summary judgment with respect to Plaintiff's breach of contract claim is denied.[2]

---

[2]  Since the Court has concluded that Plaintiff's claim sounds in breach of contract, it need not address Defendants' argument that this aspect of Plaintiff's claim is a N.Y. C.P.L.R. Article 78 claim, subject to a four-month statute of limitations.

### 5.     Unjust Enrichment Counterclaim

"To prevail on a claim for unjust enrichment, the moving party must show that the

defendant received money from or was otherwise enriched by the plaintiff to the defendant's

benefit and, pursuant to principles of equity and good conscience, the defendant should not retain

what plaintiff seeks to recover." *Deutsche Asset Mgmt., Inc. v. Callaghan*, No. 01 Civ. 4426,

2004 WL 758303, *11 (S.D.N.Y. Apr. 7, 2004) (citing, *inter alia*, *Clark v. Daby*,300 A.D.2d 732

(3d Dept. 2002)).   "[C]laims for unjust enrichment seek restitution and are based upon theories of

quasi-contract." *Deutsche Asset Mgmt.*, 2004 WL 758303, at *11 (citing *Matter of Estate of*

*Witbeck*, 245 A.D.2d 848 (3d Dept. 1997)).   "A quasi-contract is one implied by law, where none

in fact exists." *Deutsche Asset Mgmt.*, 2004 WL 758303, at *11 (citing *James v. State*, 90 A.D.2d

342 (4th Dept. 1982)).   Thus, quasi-contract relief is only available in the absence of an

enforceable written contract which governs the same subject matter between the parties. *See*

*Seiden Associates, Inc. v. ANC Holdings*, 754 F. Supp. 37, 39 (S.D.N.Y. 1991).

Defendants assert, in conclusory fashion, that they are entitled to summary judgment on

their unjust enrichment claim for repayment of the $37,000 paid to Plaintiff during his leave of

absence between August 2009 and January 2010.  Defendants argue that "[it] cannot be disputed

that the Hospital advanced Plaintiff unearned paid vacation benefits to provide him with a source

of income while he was [sic] purportedly took leave to obtain the recommended

neuropsychological follow-up evaluation and clearance to return to work." Dkt. No. 40-41 at 36.

Thus, Defendants contend, they have satisfied the enrichment prong of their counterclaim.

Next Defendants argue that the equities are in their favor because Plaintiff misrepresented

to Defendants that he had not undergone a follow-up evaluation, even though Dr. Galaburda twice

warned Plaintiff that he should not resume his practice.  Based upon the sparse record currently

before the Court, summary judgment would be inappropriate on Defendants' counterclaim.  The Court has not been presented with any financial statements or other accounting which would reflect the precise amount advanced by Defendants, and the portion of which, if any, was unearned at the time it was paid to Plaintiff.  Moreover, it is by no means clear at this stage that the equities are in Defendants favor.  That is an issue that will be resolved at trial.  In addition, although Plaintiff has not sought dismissal of Defendants' counterclaim on this basis, it appears that the Employment Agreement is a valid contract between the parties which would preclude a claim in quasi-contract.  Accordingly, and for the foregoing reasons, Defendants' motion for summary judgment on their unjust enrichment counterclaim is denied.

### IV.  CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED in part** and **DENIED in part**; and the Court further

**ORDERS** that Defendants' motion for summary judgment on Plaintiff's age and disability discrimination claims is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment on Plaintiff's individual claims against Defendants Cahalan and Chapin is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment on Plaintiff's breach of contract claim is **DENIED**; and the Court further

**ORDERS** that Defendants' motion for summary judgment on their unjust enrichment counterclaim is **DENIED**; and the Court further

**ORDERS** that Defendants **Cahalan** and **Chapin** are **DISMISSED** from this action; and the Court further

**ORDERS** that the parties' counsel shall be available for a telephone conference on March 4, 2014 at 10:00 a.m. to discuss setting a trial date; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:   February 19, 2014
   Albany, New York

Mae A. D'Agostino
U.S. District Judge

27